PATTEN (ALEXANDER v.). See Case No. 171.

PATTEN (ALEXANDRIA v.). See Case No. 186.

PATTEN (BLUNT v.). See Cases Nos. 1,579 and 1,580.

## Case No. 10,812.

PATTEN et al. v. DARLING et al.

[1 Cliff. 254.] [1]

Circuit Court, D. Massachusetts. May Term, 1859.

SHIPPING—GENERAL AVERAGE—WITNESS—COMPETENCY—MASTER—DEPOSITION.

1. In a suit by the owners of a ship against the owners of the cargo, for contribution for the loss of masts sacrificed for the common benefit of ship, cargo. and freight. the master, except in cases where he would be exonerated from some certain liability, if the owners should prevail, is a competent witness for the owners.

[Cited in The Star of Hope, 9 Wall. (76 U. S.) 230.]

2. A deposition was taken after publication had passed, and upon interrogatories filed by leave of court, and application was made to the court to suspend the commission, but counsel consenting to strike out certain interrogatories, the motion was not pressed. and this motion to suppress was made at the final hearing. *Held*, under the circumstances of the case, and inasmuch as the commission issued by special leave of court after due notice. that the deposition ought not to be suppressed.

3. Where masts and spars are cut away in a storm, and, in falling, injure the deck of a ves-

---

[1] [Reported by John A. Hayward, Esq., and George C. Hazelton, Esq.]

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

sel. or destroy rails and bulwarks, the repairs of such damage belong to general average; and it is well settled by the supreme court, that the voluntary stranding of a vessel, when required and designed for the common safety of the associated interests, constitutes a case for general contribution, even though it be followed by her total loss, provided the cargo is thereby saved.

[Cited in The Star of Hope, 9 Wall. (76 U. S.) 231.]

This was a bill in equity brought by the complainants [George F. Patten and others], owners of the ship Delaware, wherein they claimed from the owners of the cargo a contribution by way of general average, for the loss of the masts, sails, spars, and rigging of the ship, which it was alleged were sacrificed for the common benefit of the ship, cargo, and freight. On the 17th of February, 1857, the ship, then lying in the port of Savannah, took on board to be transported to Boston certain goods and merchandise consigned to the respondents. On the 2d of March following, while the ship was in Massachusetts Bay, she encountered a severe gale and snow-storm from the northward, and at half past three on the following morning it was deemed expedient to attempt to run into Nantasket Roads, for the safety of the vessel, as she was drifting westward, and at four and a half o'clock she came to anchor in nine fathoms of water, Boston Light bearing northeast. The reason for anchoring was that a strong ebb tide set the ship to leeward, insomuch that it was impossible to get up farther. While thus anchored, and at about half past nine in the morning, the tide being at about flood, the wind blowing very heavily and the sea running high, the ship swung with the tide and began to strike on the bottom. When this occurred the wind was blowing toward the shore, and it was deemed expedient by the master to cut away the masts in the hope that the ship might be prevented from drifting on shore, or if she did, she might be saved from going to pieces and being totally lost. Accordingly the master ordered the lanyards cut away, leaving the masts without any support; one of the masts then went overboard, and soon after, the wind increasing, the ship dragged her anchors and went on shore on a stony beach in Hull, near the Toddy Rocks, where the other masts also fell. By this sacrifice, alleged the complainants, the ship, cargo, and lives of the crew were saved from impending destruction, and that the ship, after the storm subsided, lay in safety on the beach, with her cargo on board, and this was afterwards taken out and delivered to the owners, who received it. Such were the substantial allegations of the bill, which also set up an agreement by the respondents [Francis Darling and others] to pay to complainants such sums of money as might be due as their share of any contribution which might be found due for sacrifices made and losses sustained for the benefit of all concerned.

None of the acts of the master after the storm commenced were admitted in the answer to be as alleged in the bill. That there was necessity for cutting away the masts; that the same conduced to the safety of the ship or cargo; that the wind was heavy; that she was expected to go to pieces if not relieved of her masts, and that she lay more easily when thus relieved, were denied. The respondents averred that the vessel lay on the beach, with her cargo after the storm, but that she was a wreck, and that the cargo was taken out in a damaged condition; that they paid all expenses in discharging the cargo, which was left in the ship at a distance from her port of destination. The cargo was received by them, as they said, with the agreement that such sums of money should be paid by them to complainants as should be fairly due for losses and expenses properly incurred, for the benefit of all interested, but they alleged those on board the ship were guilty of neglect and carelessness; that the cutting away the masts was not instrumental in saving the vessel or cargo, and that she could not have been got off from the beach and repaired; that the hull was sold for four thousand dollars, which was all it was worth.

F. C. Loring, for complainants.

The only question is, whether the value of the masts, &c., should be included in the adjustment of the general average. With reference to this there are three issues: (1) The intention with which the masts were cut away; (2) whether it tended to preserve the vessel, cargo, and freight; (3) whether they were saved thereby. In the United States courts it is held, if a ship is voluntarily stranded for the common benefit, and is thereby wrecked, the cargo is to contribute to indemnify the owners. Columbian Ins. Co. v. Ashby, 13 Pet. [38 U. S.] 331; Barnard v. Adams, 10 How. [51 U. S.] 270; Sturgess v. Cary [Case No. 13,572]. As to who is to decide when there is a peril, in order to constitute a case of general average. Lawrence v. Minturn, 17 How. [58 U. S.] 109–111. The greater and more imminent the peril, the more merit to be attributed to the sacrifice. In this case there were the three requisites to a general average,—a peril, a sacrifice, success.

B. R. Curtis and H. Durant, for respondents.

It is incumbent on the ship-owner to allege and prove: (1) That the vessel, cargo, and freight were subject to a common peril. (2) That the peril was not occasioned by want of due skill on the part of master and officers. Insurance Co. v. Sherwood, 14 How. [55 U. S.] 365; Lawrence v. Minturn, 17 How. [58 U. S.] 110. (3) That the sacrifice was voluntary, and actually and intentionally made. (4) That the sacrifice was a

reasonable and skilful act. (5) That the sacrifice was the means of relieving the interests not sacrificed from the particular peril it was designed to avert. Columbian Ins. Co. v. Ashby, 13 Pet. [38 U. S.] 338, 339; Williams v. Suffolk Ins. Co. [Case No. 17,-739]; Caze v. Reilly [Id. 2,538]; Scudder v. Bradford, 14 Pick. 13; Nickerson v. Tyson, 8 Mass. 467; Marsh. Ins. 462, 463; Stev. Av. 8; 3 Kent, Comm. 234, 235. The particular peril was the danger of dragging the anchors and going ashore. Complainants have not shown that the peril was not occasioned by the want of skill of their servants. The sacrifice of the masts was not voluntary. If a jettison of masts be made to avoid stranding, and stranding is not thereby avoided, no contribution follows. Cases above. The stranding in the case was not voluntary. Those on board no more elected any of the incidents of the stranding than the stranding itself.

CLIFFORD, Circuit Justice. Most of the circumstances attending the disaster are satisfactorily proved, and there is much less conflict in the testimony than is usual in cases of this description. As alleged in the bill of complaint, and admitted in the answer, the ship sailed from Savannah on the 17th of February, 1857, bound on a voyage to Boston. At the time of her departure she was a sea-worthy vessel, properly laden with cotton and hides, and was in every respect fit for her intended voyage. All of the sails except two were made of hemp, and they were all nearly new, and she was copper fastened. She was well manned and equipped, her whole company consisting of nineteen men, including the master, two mates, the cook, and steward. According to the testimony of the master, she was in every way in good condition when she sailed, and there is no sufficient reason from the testimony to call in question the truth of his statement. Her hull, planking-timbers, and fastenings were in good order, exhibiting no appearance of weakness or decay, and she did not leak throughout the voyage. Prior to her arrival in Massachusetts Bay she had met with no difficulty, and, for aught that appears to the contrary, was in the same condition as when she sailed from the port of departure. At six o'clock in the afternoon of the 2d of March, 1857, she was about twenty miles east of Boston Light, as estimated by the master. That evening the weather became thick and stormy, the wind varying from east to northeast, and there was a heavy sea, and during the night it snowed and the gale increased. About midnight they made Boston Light bearing west-southwest, and soon after found that the ship would go ashore unless they ran into the harbor. At that time, the master says, the ship was on a lee shore, and as he could not get a pilot he concluded to run her in without one, finding that it was impos-

sible to work her off against the wind and storm. Accordingly he sailed for Boston Light, which he passed in safety, and came to anchor in nine fathoms of water, that light bearing northeast. During the ebbtide the ship rode well and safely, but when the tide turned, the gale increased, and, the wind shifting more northerly, the ship, in swinging with the tide, commenced thumping on the bottom. In this emergency the master ordered the lanyards to be cut, in order, as he says in his first deposition, to prevent the ship from starting her anchors and going on shore. That order was nearly executed when the vessel started adrift, and the masts went over the side of the vessel soon after she struck on the beach. Considerable damage was done to the vessel by the falling of the masts. On the starboard side the mainmast, in going over, broke the rail, bulwarks, and three stanchions, and chafed and split the planksheer. Some damage was also done by the falling of the mizzen-mast. In going overboard it broke a hole through the top of the house, injuring the chains, channels, and guards, and the foremast in falling broke the rails, bulwarks, and two stanchions on the same side of the vessel. It was after the tide turned that the ship went ashore; and as the tide rose the hull was driven by the gale and the force of the sea farther up on to the beach. When the vessel struck, the wind was blowing a hurricane from the north-northeast, pressing the vessel directly on to the shore, and the sea continued to make breach over her till the tide ebbed. She went on shore between nine and ten o'clock in the morning of the 3d of March, 1857, and all the crew remained on board till ten o'clock in the evening of that day, when they were taken off in a life-boat. At that time the tide had ebbed, and there was less sea, and on the following day the storm so far moderated, that they commenced to discharge the cargo from the ship. After the discharge it appeared that she had two holes in her bottom, caused by striking against the rocks, one under her fore-chains and one under her mizzen, and several of the knees were started, and some of her beams were broken. In his second deposition, the master testifies that he consulted with his officers before cutting away the masts, and that they came to the conclusion that the vessel, in the situation in which she then was, must soon start her anchors and go ashore, in which event they expected she would go to pieces, especially if the masts were left standing. He also says, that the masts were cut away for the reason mentioned in his first deposition, but more particularly to prevent the vessel from going to pieces, in case the anchors did not hold, and she went ashore. Just as they had concluded to cut away the masts, he says all the crew came aft and wanted to get out the boats and leave the ship; but he told

them he would first cut away the masts, which might possibly keep the vessel from going ashore, and if not, would no doubt prevent her from going to pieces, and that the work of cutting the masts away was then immediately commenced.

Certain preliminary objections are taken to the testimony of the master in this case, which will now be briefly considered. In the first place, it is insisted that he is not a competent witness, and several decided cases are referred to in support of the proposition. Masters of vessels are generally competent witnesses in suits brought by the owner, except in cases where they would be exonerated from some certain liability, provided the owner should prevail. Mere bias arising from the motive to vindicate their own conduct, unaccompanied by any interest in the event of the suit, only affects their credit as witnesses, and is not in general sufficient to exclude their testimony. Where the suit is against the owner, and the master is liable to indemnify him in case the suit is maintained, or where he would be exonerated from a certain and determinate liability in case the owner prevails, in general he is not a competent witness. All of the cases referred to by the counsel for the respondent are of this latter class. One is the case of The Hope [Case No. 6,678], and another is that of The Nymph [Id. 10,389]. Those cases affirm the rule, that in a libel against a vessel for a forfeiture occasioned by the alleged misconduct of the master, he is not a competent witness, for the reason that if his acts should be adjudged illegal, and draw after them the condemnation of the vessel, he would be responsible to the owners for the consequences. They also affirm the doctrine, that the decree in the admiralty would be evidence against him in a suit by the owners for the damages. Some doubt is entertained on this last point, but it is unnecessary to determine the question at the present time. Johnson v. Huckins [Id. 7,390]; Fland. Shipp. 153. Reference is also made to the case of The William Harris [Case No. 17,-095]. That was a libel against the vessel for seamen's wages, in which the owners claimed that certain deductions ought to be made in the nature of set-off, on account of certain expenses incurred abroad, in the imprisonment of the libellant by the procurement of the master. Such expenses it seems in certain cases are paid by the master, and charged to the owners, and if the imprisonment was unnecessary, and his own conduct unjustifiable, then the charge was an improper one, and he would be liable to refund the amount so charged. He was offered as a witness in that case to justify his own conduct, and throw the expenses of the imprisonment upon the seamen, but was excluded by the court on the ground that he was interested in the event of the suit. Considerable conflict exists in the decided cases on the question, whether the master is a competent witness in a suit against the vessel or owners for seamen's wages; and authorities may be found on both sides. Unless he is called to justify an act for which, if not justified, he would himself be liable, it is generally held in England that he is a competent witness, and such appears to be the tendency of the modern authorities upon the subject. The Lady Ann, 1 Edw. Adm. 235; The Midlothian, 5 Eng. Law & Eq. 556; The Trial [Case No. 10,170]; The Hudson [Id. 6,831]; The Exeter, 2 C. Rob. Adm. 261. When not interested as part owners, masters are constantly admitted as witnesses in cases of collision, and no reason is perceived why they are not equally competent in suits for contribution. They have no immediate interest in the event of the suit, and it is certain that the decree in a case like the present would not be admissible to affect the interests of the master, in any subsequent suit which might be brought against him by the owners of the vessel. In such cases the acts of the master are only collaterally drawn in question, and, in contemplation of law, his liability for negligence at the suit of the owner is too remote and contingent to exclude him as a witness. Whatever effect it may be supposed to have upon the truth of his statements goes to his credit, and not to his competency. For these reasons I am of the opinion that the master is a competent witness. Barnard v. Adams, 10 How. [51 U. S.] 301.

Objection is made, in the next place, that the second deposition of the master was irregularly taken, and it is insisted that it ought to be suppressed. It was taken after publication had passed, but the motion to suppress was not made until the cause came on for final hearing. As stated at the argument, and not denied, it was taken on written interrogatories filed by leave of court. After leave was granted, application was made to the court to suspend the commission. On this last occasion the counsel on both sides were present, and the counsel for the complainants consenting to strike out certain interrogatories, the motion to suspend the commission was not pressed to a decision. Under these circumstances, I am of opinion that the objection was waived, and, inasmuch as the commission issued by the special leave of the court after due notice, I think the deposition ought not to be suppressed.

Twelve other witnesses were examined by the complainants, five of whom saw the ship on the morning of the disaster. None of them, however, were on board the vessel before she went ashore, and as their statements respecting the circumstances of the disaster, so far as they are within their knowledge, substantially confirm the statement of the master, it would be useless to repeat them. Some twenty witnesses were also examined by the respondents, and eleven or more of

that number also saw the vessel, but were not on board before the ship was stranded on the beach. Five of them were in a pilot-boat, and at one time approached very near the vessel while she lay at anchor, but as their testimony has respect chiefly to the questions whether the master exercised proper skill and diligence to prevent or avert the disaster, or whether the sacrifice made was necessary to avoid the peril, or was attended with success, it will be considered in connection with the several propositions assumed by the counsel for the respondents. In respect to the immediate circumstances of the disaster, the witnesses of the respondents do not differ materially from the statements made by the master. A claim for contribution by way of general average rests upon certain elementary principles of law which have long since been well settled. Such claims have their foundation in equity, and rest upon the doctrine that whatever is sacrificed for the common benefit and safety of the associated interests shall be made good by all. That principle, says Grier, J., in Barnard v. Adams, 10 How. [51 U. S.] 303, is recommended not only by its equity but by its policy, because it encourages the owner to throw away his property without hesitation in time of need. In order to constitute a case for general average, the same learned judge remarks that three things must concur—First, there must be a common danger in which the ship, cargo, and crew all participate, and that danger must be imminent and apparently inevitable, except by incurring a loss of a portion of the associated interests to save the remainder; in the second place, there must be a voluntary jettison, or casting away of some portion of the associated interests, for the purpose of avoiding the common peril, or, in other words, a voluntary transfer of the peril from the whole to a particular portion of those interests; thirdly, the attempt so made to avoid the common peril must be successful. Every such sacrifice must be made deliberately and with the object of saving or protecting the remainder of the property at stake. Whenever the peril of a common destruction is apparently so great as to compel the master, in the exercise of proper skill and judgment, to choose between the loss of the ship, cargo, and the lives of those on board, and the jettison or casting away of a part of the associated interests, the master is justified, and indeed it is his duty, to make the sacrifice for the benefit of all concerned. But the right to contribution is not made to depend on any presumed or real intention to destroy the thing cast away, but on the fact that it was selected, under the circumstances before mentioned, to suffer the common peril in the place of the whole of the associated interests, that the remainder might be saved. Much is deferred in such an emergency to the judgment and decision of the master, in whose custody, and under whose control, all those interests are necessarily placed. Owners of vessels are under the obligation to employ masters who are competent, and who have reasonable skill, judgment, and courage in the performance of their duties, and they are liable if, through their failure to possess or exert these qualities in the control and management of the vessels under their command, the goods or merchandise of the shipper are damaged or destroyed. They do not, however, contract that they shall possess such qualities in an extraordinary degree, nor that they shall do in any given emergency precisely what, after the event, others may think would have been best. It was so held in Lawrence v. Minturn, 17 How. [58 U. S.] 110, and the conclusion of the court in that case appears to be just and reasonable. From the necessity of the case, the law imposes upon the master the duty and clothes him with the power to judge and determine whether the circumstances of danger which surround the vessel, cargo, and crew are or are not so great and pressing as to render a jettison of a portion of the associated interests expedient and necessary, for the common safety of the remainder. Standing upon the deck of the vessel, with a full knowledge of her strength and condition, and of the state of the elements which threaten a common destruction in judgment of law, he can best decide, in the emergency, what the necessities of the moment require to save the property intrusted to his care, and the lives of those on board. In contemplation of law he derives this authority from the implied consent of all concerned, and, in the absence of any proof to the contrary, it must be presumed that his decision was wisely and properly made.

Accordingly, it was held in Lawrence v. Minturn [supra], and the principle was subsequently affirmed in Dupont v. Vance, 19 How. [60 U. S.] 166, that, if he was a competent master, if an emergency actually existed, calling for a decision whether or not to make a jettison of a part of the cargo, if he appears to have arrived at his decision with due deliberation by a fair exercise of his skill and discretion, with no unreasonable timidity, and with an honest intent to do his duty, the jettison is lawful. In all such cases the sacrifice made will be deemed to have been necessary for the common safety, because the person to whom the law has intrusted the power to decide upon and make it has duly exercised that authority. It is not denied by the counsel of the respondents, that the ship, cargo, and crew in this case were subject to a common danger, but it is contended that the particular peril impending at the time the masts were cut away was the danger that the ship would drag her anchors and go ashore, and it is insisted that she was not saved from that particular peril. Notwithstanding the masts were cut away, the vessel went ashore, but the goods and crew were saved. Some stress is laid upon the fact, that the master, in his first deposition,

stated that his intent in cutting away the masts was to prevent the ship from starting her anchors and going ashore, but it should not be overlooked that he also stated, in the same deposition, that they were afraid the vessel would go to pieces from the effect of the sea or by striking against the rocks to which she was driving. His second deposition explains more fully his precise intent, or rather the hopes and fears he entertained at the time the masts and spars were cut away, and every one of those explanations is perfectly consistent with his statements in the first deposition. By cutting away the masts and spars, he hoped that the anchors would hold, and that the ship might ride out the storm. But if not, and she should go ashore, that she would thereby be prevented from going to pieces upon the rocks, and that the crew and cargo might be saved. That two-fold purpose is so obvious from all the attending circumstances, that one would scarcely fail to see and understand it, even if it were less clearly indicated than it is in his first deposition. Common experience teaches that a vessel, in going ashore in a storm on a rocky beach, is less likely to go to pieces with her masts down than while they are standing, and testimony to the contrary is entitled to very little weight. After a careful comparison of the two depositions given by the master, I am of the opinion that they do not conflict in any material respect, and that there is nothing in either to impair the credit of the deponent. All the associated interests were in peril, not only from the liability of the vessel's going ashore, but of a total destruction from the elements, and from this latter peril they were all saved. Common prudence required that the master should look beyond the mere hazard that the anchors were liable to drag, to the danger that the vessel might be dashed against the contiguous rocks; and if he had been less candid in his statements, and had denied that his intent in cutting away the masts and spars was to avoid the peril of a common destruction in case the vessel went ashore, he would not, under the circumstances proved, have been entitled to credit. When masts and spars which have been cut away injure the deck of the vessel in falling, or destroy rails and bulwarks, or do other damage, the repairs of such damage belong to general average; and it is well settled by the supreme court that the voluntary stranding of a vessel, when required and designed for the common safety of the associated interests, constitutes a case for general contribution, even though it be followed by her total loss, provided the cargo is thereby saved. Columbian Ins. Co. v. Ashby, 13 Pet. [38 U. S.] 343; Barnard v. Adams, 10 How. [51 U. S.] 302. That doctrine is denied in some jurisdictions, but it is settled law in this court, and it is believed to rest upon the solid foundations of reason and justice. Caze v. Reilly [Case No. 2,538]; Sims v. Gurney, 4 Bin. 513; Gray v. Waln, 2 Serg. & R. 229.

In the next place it is insisted by the counsel for the respondents that the complainants have not shown that the peril in question was not occasioned by want of due skill, exertions, and vigilance on the part of the master, officers, and crew of the ship. To support this proposition, they assume, in the outset, that whatever dangers the ship encountered arose from her being at anchor in the place where she lay at the time the order to cut away the masts and spars was given, and they insist that the causes which rendered it necessary to anchor there at four o'clock in the morning of the 2d of March, 1857, did not continue to operate at the time the order was executed, and that it was not necessary to remain there after daylight on the day of the disaster. Impliedly, the proposition admits that it was necessary to anchor there on the morning before the disaster, and the bill alleges in effect that the storm continued, and the wind increased till after the vessel went ashore. In his second deposition, the master says, that he was not at all acquainted with the anchorage where the ship lay, and judged that there was no chance of removing the vessel to a place of greater safety. He consulted with his subordinate officers before he decided to cut away the masts, and there is much reason to conclude that, if he had not so decided, the crew would have left the ship in the boats. On the point whether the master ought not to have made an effort to remove the vessel to some other place, a great number of witnesses were examined by the respondents. Many express the opinion that he ought to have done so, while others speak with less confidence or with some hesitation; and another class say, with more reason, that, if he had been acquainted with the anchorage, he ought not to have remained where he was, but admit that it would be different with a stranger, or one not acquainted with his situation, and some of them say that if he did not know the ground, it was not imprudent to remain where he was. He was wholly unacquainted with his situation; and, in the midst of the difficulties and uncertainties which surrounded him, I am of the opinion that he was not wanting in the exercise of reasonable skill and diligence. Those who encounter danger cannot always suit mere lookers-on in the choice of the means they employ to avert it, for the reason that it is easier to find fault than to do in any such emergency. In this case the master had every motive to employ the best means in his power to save the vessel, cargo, and crew, and there is no sufficient evidence in the case to show that he did not perform his duty with coolness, and with the best lights of his judgment. All on board were participants in a common danger, and there is no proof in the case that they did not all concur in the propriety of the master's acts. When the crew came aft with the view to take the boats and abandon the ship, they did not complain that anything had been omit-

ted which ought to have been done, nor did they suggest any other means of avoiding the peril than that proposed by the master.

It is also insisted by the respondents that the master was guilty of negligence, in not adopting reasonable and proper means to secure the assistance of a pilot on the morning of the disaster. On this branch of the case, there is some conflict in the testimony. Four or five pilots belonging to the pilot-boat Phantom were examined by the respondents. One of them testifies that the pilot-boat was lying in the sand-cove, near the narrows, and that, seeing a light about five o'clock that morning, they slipped their chain and ran down in that direction. Others testify to the effect that they saw the light of the vessel before daylight, between five and six o'clock in the morning. She was then lying at anchor, and, according to their testimony, they sailed within three or four hundred feet of her, but admit that they were afraid to round her stern, because she was so near the beach they thought their boat might hit the bottom, and, seeing no one on the deck of the vessel, they immediately withdrew, but shortly afterwards repeated the experiment with a like result. Subsequently they were about to approach her for a third time, but seeing a British steamer coming in, they stood away to put a pilot on board the steamer. After having boarded the steamer, and while they were running up the channel, they, for the first time, saw a signal for a pilot in the fore rigging of the ship, but they admit it was of no use at that time to try to get her away, as the wind had shifted more to the northward. Every one of these witnesses saw the vessel before daylight, and in effect admit that they knew she was in need of a pilot. Their excuse for not going on board is, that there was no signal set, or hail made from the vessel. On the other hand, the master testifies that some one was on deck all the time, and that he himself was not below after anchoring, for more than ten minutes at any one time until the vessel went ashore. He saw the pilot-boat get under way and work out to the windward of the ship, but says she did not come within hailing distance; and he further says, that when she proceeded to the steamer he set the signal for a pilot in the fore rigging of the ship, lest the pilot should think he was supplied. At that time all the sails of the ship were furled, and the master says that the signal could be seen from the fore rigging as easily as from the foremast-head. All the circumstances tend to show that the signal was set as soon as the master considered that the vessel was in danger. Unacquainted as he was with the anchorage, it would be unreasonable to suppose that he could have anticipated, in the midst of a northeast storm, at that hour of the morning, that the wind would change with the tide at half past nine. As soon as he saw the pilot-boat, and found that she was standing away from his vessel, he set the signal. That sig-

nal was seen by the pilots, and answered every purpose that it would have done if it had been set at the mast-head. But it communicated to the pilots no information which they did not already possess. They knew the vessel was in danger, and had acted upon that knowledge from the time they first approached her to the period when they went to the relief of the steamer. Two or more of them admit that the vessel was so near the beach that they did not deem it prudent to round her stern, and I am satisfied from the evidence that the leeward position of the vessel had more influence in deterring the pilots from boarding her, than the absence of the signal, or the omission to hail by the officers and crew. They were acquainted with the anchorage, and knew the dangers which surrounded the vessel; and if they had been disposed to go to her relief, or had thought it prudent so to do, it is incredible to suppose that they would have been deterred from so praiseworthy an act by the absence of a signal, or the failure of the crew to hail. Had they been ignorant of the peculiarities of the place, or if they had had any sufficient reason to suppose that the master was well acquainted with his situation, there might be some merit in this excuse. Neither of those reasons, however, has any foundation in the fact, and, in view of all the circumstances, this ground of defence must be overruled. For these reasons I am of the opinion that the relief prayed for in the bill of complaint ought to be granted, and when the amount to be recovered is ascertained, the complainants will be entitled to a decree in their favor. Should any dispute arise in ascertaining the amount, the cause must be referred to a master for that purpose.